**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LARYSSA MUNTEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-10660 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ILLINOIS DEPARTMENT OF HEALTH | ) | |
| AND FAMILY SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Laryssa Muntean has brought this lawsuit against her former employer,

Defendant Illinois Department of Healthcare and Family Services ("IDHFS"), alleging that

IDHFS subjected her to various forms of discrimination and retaliated against her for complaining

about it. Now before this Court is IDHFS's motion for summary judgment. (Dkt. No. 42.) For the

reasons stated below, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The Court views the record in the light most favorable to Muntean and draws all

reasonable inferences in her favor. *See Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).

Muntean, a Caucasian woman of Romanian ancestry, began her employment with IDHFS

as a child support service trainee around April 6, 2013. (Plaintiff's Response to Defendant's Rule

56.1 Statement of Uncontested Facts ("PRDSUF") ¶¶ 3, 5, Dkt. No. 51; Defendant's Response to

Plaintiff's Local Rule 56.1(b) Statement of Additional Facts ("DRPSAF") ¶ 59, Dkt. No. 53.)

Muntean was the only Caucasian employee in her unit. (DRPSAF ¶¶ 86–91; Ex. B 148:1–2, Dkt.

No. 44-2.) Her immediate supervisor, Diane Martin, and the next person in the chain of command,

Gwendolyn Lee, were African American. (PRDSUF ¶ 11; DRPSAF ¶¶ 86, 88.) Muntean had a

number of medical conditions, including bladder, intestine, and spinal ailments. (DRPSAF ¶ 76.) In May 2014, she was also diagnosed with post-traumatic stress disorder ("PTSD"). (DRPSAF ¶ 76; Dkt. No. 63.)

During her time at IDHFS, Muntean experienced several issues, which she reported to her supervisor and others. Around August 14, 2013, Muntean was attacked by her co-worker, Lizbette Rodriguez, who put her in a tight hold or a choke hold.[1] (PRDSUF ¶¶ 19–21.) Muntean reported the attack to IDHFS and was referred to an employee assistance program for counseling and therapy; she also filed a police report relating to the attack. (DRPSAF ¶ 68; PRDSUF ¶¶ 23, 24.) The attack was not an isolated incident. Around the same time, Rodriguez bullied Muntean by telling her to follow improper procedures so she would get in trouble, complaining that Muntean used bathroom too often, and, according to what Martin told her, falsely reporting that Muntean took too long with IDHFS clients. (DRPSAF ¶¶ 69, 70; Ex. B 66:7–70:13.)

After the attack by Rodriguez, Muntean took a leave of absence from October 10, 2013 to March 17, 2014 due to a foot surgery. (DRPSAF ¶ 71.) Muntean thought that she would be transferred away from Rodriguez, but upon her return to work, IDHFS's regional manager told Muntean to sit right next to Rodriguez. (*Id.* ¶¶ 71, 74.) This did not go well—Rodriguez gave Muntean "dirty looks," made moves toward her, and tried to corner Muntean into the door. (*Id.* ¶ 71; Ex. B 88:5–9.) The situation deteriorated even further when, instead of addressing Muntean's concerns regarding Rodriguez, Muntean's union representative insisted that Muntean (who is a Marine Corps veteran) should learn how to defend herself in a workplace and record her conversations with Rodriguez. (DRPSAF ¶ 75; Ex. B 93:1–94:17.) As a result, Muntean felt unsafe and stressed out, and she ended up being hospitalized due to stress. (DRPSAF ¶ 75, Ex. B

---

[1] IDHFS insists that each time Muntean retells her story, the description of the accident becomes more severe. (Dkt. No. 43 at 5 n.2.)

76:20–22.) For these reasons, Muntean took a medical leave from April 24, 2014 to May 13, 2014. (Ex. B 92:23–94:17.) On May 13, 2014, Muntean was diagnosed with PTSD due to work-related violence. (Dkt. No. 63; Ex. B 118:11–119:5.) From May 15, 2014 to October 1, 2014, Muntean took a medical leave due to her feeling unsafe at work and PTSD. (Ex. B 97:11–98:3.)

Muntean also encountered problems at work related to her health conditions. For example, when Muntean started to work for IDHFS, Lee, who is confined to a wheelchair herself, asked Muntean to disclose the nature of her disabilities and surgical procedures in front of her co-workers. (DRPSAF ¶ 77; PRDSUF ¶ 38; Ex. B 99:19–104:7.) Lee repeatedly challenged Muntean's need for leave under the Family and Medical Leave Act ("FMLA") by saying that Lee did not believe that there was anything wrong with Muntean and asking Muntean to show her surgical scars. (DRPSAF ¶¶ 78, 79.) Muntean's other supervisor, Martin, also told Muntean that she was treated differently due to her disabilities and that Lee was getting mad at Muntean for using FMLA leave. (Ex. B 149:24–150:17.) In July 2013,[2] when IDHFS provided a medical chair to Muntean due to her spinal issues, her co-worker Michael taunted Muntean by jumping on the chair, asking another co-worker, Christy Norwood, whether he looked like Muntean, and noting that Muntean looked like there was nothing wrong with her. Norwood replied "Yeah" in agreement. (PRDSUF ¶ 39; Ex. B 124:8–126:5, 133:12–136:2; Dkt. No 51-1 at 2.) Norwood also commented to Michael that she did not want to be like Muntean—always taking time off when there was nothing wrong with her. (Ex. B 126:15–20.)

Muntean also describes issues related to her national origin, religion, and race. For example, around June 2013, Rodriguez (who is Puerto Rican) and Mary Miller (who is African

---

[2] Muntean initially testified that the chair incident happened "[a]s soon as they issued that chair," "around springtime of 2014." (Muntean Dep. 125:10–12.) However, she later clarified that the incident occurred when the chair had just arrived, and her email confirms that it was around July 2013. (*Id.* 135:15–18; Dkt. No. 44-2 at 95.)

American) started to remark that Muntean looked Hispanic, not Romanian. (PRDSUF ¶¶ 17, 18; Ex. B 46:18–47:6; DRPSAF ¶¶ 87, 89.) They also commented that if Muntean were Romanian, she must be a gymnast, and they would do jumping jacks to mock her. (PRDSUF ¶ 18.) Other co-workers also referred to Muntean as a gymnast and did jumping jacks. (Ex. B 54:10–55:8.) Moreover, Rodriguez and Miller referred Spanish-speaking clients to Muntean on many occasions, despite Muntean's assertions that she did not speak Spanish. (PRDSUF ¶ 18; Ex. B 47:12–48:7.) Miller also remarked to Muntean: "Oh, can't you speak another language? You're white then." (Dkt. No. 51-1 at 2.) Around June 2013, Rodriguez and Miller commented on Muntean's religion (Eastern Orthodox)—in particular, they questioned Muntean's belief in Jesus, noted that Eastern Orthodox Easter was not as good as Catholic Easter, and remarked that the Eastern Orthodox tradition of painting eggs one color was due to believers' inability to afford other paint colors. (Ex. B 145:11–146:16.) In March 2014, Miller purportedly told Muntean's supervisor, Martin, that Miller did not "want to be like that stupid white bitch Laryssa, sitting in her chair in the middle of the room." (PRDSUF ¶ 16; Ex. B 42:6–43:24.) Martin also told Muntean that Miller said similar things to co-workers and in front of clients. (PRDSUF ¶ 16) According to what Martin told Muntean, Rodriguez, Norwood (who is African American), and Lee used similar terms when talking about Muntean. (Ex. B 45:2–46:15; DRPSAF ¶¶ 89, 90.) Martin also told Muntean that Muntean was treated differently because she was Caucasian. (Ex. B 147:14–148:6.)

According to Muntean, she was treated worse than non-Caucasian employees in her unit in other ways as well. For example, Rodriguez and Miller were allowed to take longer lunch breaks, did not have to come back at the scheduled time, and did not have to do daily accountable reports. (PRDSUF ¶¶ 26, 27; Ex. B 56:19–60:9, 148:1–9.)

Muntean also describes several issues related to her requests to transfer. The first issue arose in June 2013 because her prior employer, the Illinois Department of Employment Security ("IDES"), was in the same building as IDHFS. (PRDSUF ¶ 41.) Muntean previously had filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights about being physically assaulted, sexually harassed, and discriminated against by IDES employees. (*Id.*) Thus, she did not want to be in the same building as IDES. Muntean was told that she could not transfer on an emergency basis due to the applicable bargaining unit contractual obligations but she could initiate a bargaining unit transfer or bid on other vacant positions, and she should contact the Executive Inspector General's Office if she had any issues with IDES employees. (*Id.* ¶ 42.)

Muntean was also given a short transfer accommodation to another location (*Id.* ¶ 32; Dkt. No. 44-2 at 101.) In March 2014, Muntean made a second transfer request—this time, due to the alleged workplace violence by Rodriguez. (PRDSUF ¶ 43.) Muntean's request did not mention race or disability but centered on Muntean feeling unsafe in her workplace. (*Id.* ¶ 46.)[3] She was told that she could request a hardship transfer request through the union or the Bureau of Labor relations, that her workplace violence complaint should be addressed to the Bureau of Internal Affairs, and that she could contact the bureau if she felt unsafe at work. (*Id.* ¶ 43.) Muntean was also told that any transfer requests must adhere to the terms of her collective bargaining agreement and that under those terms she did not have a right to request a transfer as she was still on a probationary status. (*Id.* ¶ 44, 45.) Muntean insisted that she was not on a probationary status. (*Id.* ¶ 44.)

---

[3] Although it appears that in her earlier emails Muntean simply requested a transfer based on "feeling unsafe" after the incident with Rodriguez, she also testified that she later provided IDHFS with a physician's statement dated May 13, 2014 describing her diagnosis as PTSD. (PRDSUF ¶ 46; Muntean Dep. 116:23–119:8.)

Muntean ended her employment with IDHFS on September 30, 2014 and started her new job on October 1, 2014, with no break in service and no issues obtaining employment with the State of Illinois. (PRDSUF ¶¶ 8, 9.) Muntean filed her EEOC charge against IDHFS with the Illinois Department of Human Rights on November 24, 2014, alleging discrimination based on race and disability, as well as retaliation. (Dkt. No. 44-2 at 145.) The charge did not allege any discrimination based on national origin or religion—Muntean claims she did not know of her rights related to religion and thought that her race was the same thing as her national origin. (DRPSAF ¶ 60; Ex. B 147:6–9.)

**DISCUSSION**

Summary judgment is appropriate if the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008). Evidence submitted in connection with summary judgment need not be admissible in form, but it must be admissible in content. *Hardrick*, 522 F.3d at 761. A genuine issue of material fact exists if a reasonable jury could find in favor of the nonmoving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

**I.        Incidents before January 30, 2014**

Under Title VII of the Civil Rights Act of 1964 ("Title VII") and Illinois law, Muntean is required to file a charge with the EEOC within 300 days of an alleged unlawful employment practice in order to preserve her right to file a lawsuit. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Boston v. U.S. Steel Corp.*, 816 F.3d 455, 463 (7th Cir. 2016). Muntean filed her EEOC charge on

November 26, 2014. (PRDSUF ¶ 52.) Thus, according to IDHFS, her discrimination claims based on actions that occurred prior to January 30, 2014 (*i.e.*, 300 days prior to her EEOC filing) are time-barred.

Title VII generally covers two types of employment discrimination—discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or refusal to hire, and acts that create a hostile workplace. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). The statute of limitations applies differently depending on whether the plaintiff asserts a claim for a discrete act or for a hostile work environment. *Id*. at 684. For discrete acts, the statute of limitations precludes recovery for acts that occur outside the statutory time period. *Id*. But hostile environment claims are different. *See id.*; *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Hostile environment claims are based on the cumulative effect of individual acts. *Morgan*, 536 U.S. at 115. It does not matter that some of the component acts of the hostile work environment fall outside the statutory time period; provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Id*. at 117. That act, however, need not be the last act. As long as the employer has engaged in enough activity to constitute an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. *Id*. Subsequent events may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole. *Id*.

IDHFS argues that Muntean's "allegations before January 30, 2014 are time barred." (Dkt. No. 43 at 14.) In support of its argument, IDHFS asserts that "many of Plaintiff's claims of discrimination that occurred prior to January 30, 2014 . . . are precluded. This would include

Plaintiff's allegations that she was 'attacked' by Ms. Rodriguez in August 2013 and that she was harassed based on her disability by both co-workers and Ms. Lee in 2013." (*Id.* at 14, 15.) In her response, Muntean does not appear to contest that her claims based on the discrete events prior to cut-off date are time-barred, unless the continuous violation doctrine applies. Accordingly, Muntean's claims based on discrete acts of discrimination before January 30, 2014 are time-barred. *See Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002); *see also Turner*, 595 F.3d at 684. However, pre-January 2014 events may be used to support a claim of a hostile work environment that began prior to January 2014 and continued post-January 2014. Such a claim would not be barred. *See Morgan*, 536 U.S. at 117–18.

Moreover, Muntean may be able to present evidence related to discrete events that occurred before January 2014 for evidentiary purposes related to proving her post-January 2014 claims. For example, pre-January 2014 events may be relevant to show her employer's knowledge or state of mind. *See Morgan*, 536 U.S. at 113 ("the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim").

## II.     Claims Beyond the Scope of the EEOC Charge

As a general rule, a plaintiff may not bring claims in a Title VII lawsuit that were not included in her EEOC charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). The purpose of this rule is to afford the EEOC and the employer an opportunity to settle the dispute, as well as to give the employer some warning of the conduct about which the employee is aggrieved. *Id.* However, because most EEOC charges are completed by lay persons, a Title VII plaintiff need not allege in an EEOC charge each and every fact that forms the basis of each claim in the complaint. *Id.* Instead, a plaintiff may bring Title VII claims if there is a reasonable relationship between the allegations in the EEOC charge and the claims in the complaint, and the

claims in the complaint could reasonably have been expected to grow out of an EEOC investigation of the allegations in the EEOC charge. *Id.* For the first part of the test, claims are not reasonably related unless there is a factual relationship between them—the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals. *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995). The second part of the test is more difficult, as it requires courts to speculate about what the EEOC might or might not discover in the course of an investigation. *See Cheek*, 31 F.3d at 500.

Muntean's EEOC charge does not allege discrimination based on religion or national origin. Muntean insists that she thought that race and national origin were the same thing, that she amended her EEOC charge and brought up national origin and religion to the Illinois Department of Human Rights and the EEOC, and that her national origin and religion discrimination claims were reasonably related to her race discrimination claim. But Muntean has provided no documentation to support her claim that she amended the EEOC charge. The only evidence Muntean cites in support of her contention that she amended her EEOC charge and raised religion and national origin discrimination claims, is her own testimony. (*See* Dkt. No. 50 at 14, 15; DRPSAF ¶ 64 (citing Ex. B 33:20–22, 35:12–18).) But a closer examination of her testimony reveals that, at the time of the EEOC charge, Muntean did not realize that she had rights relating to religious discrimination and did not know that race and national origin were not the same thing—hence, she did not include such allegations in her EEOC charge. (Ex. B 35:16–38:5, 144:11–21, 147:2–13.) Therefore, Muntean's religion and national origin claims are barred unless they are reasonably related to the allegations that were included in her EEOC charge.

Muntean argues that her national origin and religion-based claims are reasonably related to the claims in the EEOC charge because the same situations and employees were involved in all

the claims. Indeed, it appears that Rodriguez and Miller were at the center of Muntean's work troubles related not only to race but also national origin and religion. Muntean thus has satisfied the reasonable-relationship requirement for the allegations in the EEOC charge and her national origin and religion claims. *See Harper*, 45 F.3d at 148.

Nonetheless, the Court concludes that the claims based on her religion could not have been expected to grow out of an EEOC investigation of the allegations in Muntean's EEOC charge. Indeed, the mention of her Eastern Orthodox religion by her co-workers appears to have been a stray comment with little connection to the overall pattern of harassment alleged by Muntean. Muntean provides no basis from which this Court can conclude that the EEOC would have discovered a basis for a religious discrimination claim. In contrast, Muntean's claims based on national origin and race are more closely intertwined. It is reasonable to assume that an investigation of race-based claims by the only Caucasian employee of Romanian ancestry in her workplace would reasonably lead to national origin claims—this is especially so considering that her co-workers not only commented on her being white, but also on her looking not Romanian, but Hispanic, mocked her language skills, and suggested she was a gymnast. *See, e.g., Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007) ("In the federal courts, there is uncertainty about what constitutes race versus national origin discrimination under Title VII."); *see also* 29 C.F.R. § 1606.1 (defining national origin discrimination broadly as including "the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group"). As a result, while Muntean's claim based on religion fails, her national origin claim survives.

### III.    Claims Based on Race and National Origin

Title VII prohibits an employer from discriminating against an employee on the basis of that employee's race or national origin. *See* 42 U.S.C. § 2000e–2(a). Muntean asserts that IDHFS discriminated against her by subjecting her to differing terms of employment, creating a hostile work environment, and forcing her to quit her job. The Court addresses each issue in turn.

### A.    Differing Terms of Employment

The Court first considers Muntean's claims that IDHFS subjected her to differing terms of employment due to her race. In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), the Seventh Circuit emphasized that, notwithstanding the multifactor tests frequently cited in employment discrimination cases, the proper standard for summary judgment is simply whether a reasonable juror could conclude that the plaintiff's protected characteristic caused an adverse employment action. One way that Muntean may show that a reasonable juror could reach such a conclusion is by using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017); *see also David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties have presented their arguments under *McDonnell Douglas* framework, the Court begins its analysis there. *See David*, 846 F.3d at 224. But ultimately, the Court assesses all the evidence cumulatively to determine whether it would permit a reasonable factfinder to determine that the adverse employment actions Muntean suffered are attributable to her race or national origin. *Id.*

Under the *McDonnell Douglas* framework (as modified for a reverse discrimination case), Muntean must show that: (1) background circumstances exist to demonstrate an inference that IDHFS has a reason or inclination to discriminate against Caucasians or evidence that there is

something "fishy" about the facts at hand; (2) Muntean was meeting IDHFS's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated individuals who are not members of her group. *See Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016). If Muntean establishes her *prima facie* case, then the burden shifts to IDHFS to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If IDHFS meets this burden, then the burden shifts back to Muntean to show that the reasons given by IDHFS are a pretext for discrimination. *Id.* IDHFS argues that Muntean has not met the first, third, and fourth elements of the *prima facie* case.

Regarding the first element, IDHFS argues that there is no evidence to demonstrate any racial animus on the part of IDHFS apart from the hearsay statements from Muntean's direct supervisor, Martin, who is now deceased. IDHFS also argues that there is nothing in the record to show that Rodriguez's attack on Muntean was based on racial animus, rather than personal animosity. Muntean, in turn, points out that she was the only Caucasian employee in her department, that Lee treated non-Caucasian employees preferentially (with regard to taking lunch breaks and doing daily reports), that Martin told Muntean that she was treated differently due to her race, and that Miller made racial comments regarding Muntean and kept referring Spanish-speaking clients to her despite Muntean's inability to understand them.

Contrary to IDHFS's assertions, Martin's statements are not mere "hearsay," as they are not offered here simply for the truth of the matter asserted—such as that Muntean was in fact treated differently due to her race or that Muntean's co-workers in fact called her "white bitch." Rather, the statements are offered to show that there is something fishy going on at IDHFS if Muntean's African-American supervisor said such things to Muntean. And, at least the portion of the statement that Muntean was treated differently due to her race is potentially admissible as an

admission by a party-opponent. *See* Fed. R. Civ. P. 801(d). Moreover, as discussed above, Martin's statements are not the only evidence offered by Muntean. There is also the fact that Muntean was the only Caucasian employee in her unit, Muntean's assertions that non-Caucasian employees were treated better than her, and co-workers' comments about Muntean's "Hispanic" appearance and language skills. Accordingly, Muntean has satisfied the first element of the *McDonnell Douglas* framework.

Regarding the third element, *i.e.*, that Muntean suffered adverse employment action, not everything that makes an employee unhappy constitutes an actionable adverse action. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009). There are three general categories of actionable, materially-adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects; and (3) cases in which the employee is subjected to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in a workplace. *Id.* Muntean's complaint and response to the summary judgment motion contend that she suffered adverse employment actions in the form of unequal lunch break practices and being forced to do daily accountability reports. But instances of different treatment that have little or no effect on an employee's job do not rise to the level of a materially adverse employment action. *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). Muntean offers no evidence that her co-worker's longer lunches interfered with her job. And the record shows that if her co-workers were not back within the allotted time to relieve her, she would ask her supervisor to go to lunch. (PRDSUF ¶¶ 26, 27; Ex. B 57:10–14.) Moreover, it appears that doing daily accountability reports was well within Muntean's job duties and therefore not an adverse action.

*O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (requiring plaintiff to perform tasks that are well within the reasonable scope of plaintiff's work duties does not constitute an adverse employment action). As a result, Muntean's claims based on lunch break policy and accountability reports fail.

**B.      Hostile Work Environment**

To survive summary judgment on her hostile work environment claims, Muntean must offer sufficient evidence to present a material issue of fact on four elements: (1) her work environment must have been subjectively and objectively offensive; (2) her race and/or national origin must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability, meaning either that a supervisor participated in the harassment or that IDHFS was negligent in discovering or remedying co-worker harassment. *See Liu v. Cook Cty.*, 817 F.3d 307, 318 (7th Cir. 2016); *see also Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (analyzing a hostile work environment claim in the context of a reverse racial discrimination).

The first element requires Muntean to show that a reasonable person would find her work environment hostile or abusive and that she in fact did perceive it to be so. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011). When analyzing objective hostility, courts may consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) 'whether it is physically threatening or humiliating, or a mere offensive utterance'; and (4) whether it unreasonably interferes with the employee's ability to complete his or her assigned duties." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004). For the third element, the harassment must be severe or pervasive enough to alter the employee's ability to perform her assigned duties. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 851 (7th Cir. 2007).

IDHFS argues that Muntean claims must fail because a reasonable person would not find Muntean's work environment hostile or abusive and the causation element is also unfulfilled, at least as it relates to Rodriguez's conduct, because Rodriguez did not have a broader pattern of hostility towards Caucasians. A work environment that is not physically threatening, nor openly racist, nor unreasonably interfering with an employee's performance does not satisfy the objective element of a hostile work environment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). But this is not the kind of environment Muntean describes here. To the contrary, Muntean describes that Rodriguez bullied her by trying to get her into trouble, then put her in a choke hold, and, once Muntean was forced to sit next to Rodriguez, Rodriguez gave her dirty looks, cornered her into the doorway, and tried to put her body really close to Muntean's. (Ex. B 78:24–79:15, 88:7–9.) *Cf. Smith v. Sheahan*, 189 F. 3d 529, 531–34 (7th Cir. 1999). Moreover, Muntean links that environment to her protected characteristics as there were comments by Rodriguez and other co-workers about Muntean's Romanian national original, her looking Hispanic, and her language skills (and the relation of those skills to her being white), as well as the referral of Spanish-speaking clients to Muntean. Therefore, Muntean's hostile work environment claims survive.

Regarding the fourth element of a hostile work environment claim, when a case involves a supervisor, the employer will be held strictly liable for the alleged conduct if there was a tangible employment action such as a discharge, demotion, or a change in working conditions. *See Roby v. CWI, Inc.,* 579 F.3d 779, 784 (7th Cir. 2009). A constructive discharge may also be considered a tangible employment action. *Id.* If there was no tangible employment action, then an employee is entitled to assert an affirmative defense that "(1) it exercised reasonable care or diligence to

prevent and correct any harassing behavior; and (2) that [an employee] unreasonably failed to take advantage of any preventive or corrective opportunities to avoid harm." *Id.*

IDHFS argues that "one instance of unwanted contact[,] a few alleged random statements regarding her race," and simply being placed next to Rodriguez is not enough for constructive discharge. (Dkt. No. 43 at 11.) Muntean counters that IDHFS had a year to remedy the situation by providing training, separating Rodriguez and Muntean, or transferring Muntean to another location, but nothing was done.

To show that the hostile work environment at IDHFS resulted in her constructive discharge, Muntean needs to demonstrate that a hostile work environment existed, and that the environment was so intolerable that her resignation was an appropriate response. *See McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). The working conditions for constructive discharge must be even more egregious than the high standard for a hostile work environment because an employee generally is expected to remain employed while seeking redress. *Id.* Thus, in *Roby v. CWI, Inc.*, the Seventh Circuit held that requiring the plaintiff to keep working close to a harasser was not enough for a constructive discharge claim, as there was no evidence that the alleged harasser spent an inordinate time or hovered around the plaintiff, and the employer made efforts to minimize the plaintiff's contact with the harasser. 579 F.3d at 785–86.

The present case is different, as it appears that Muntean actually spent time around Rodriguez after the attack. Yet it does not appear that the work hostilities here were so egregious that a reasonable employee would quit. Muntean found out that she had to sit next to Rodriguez around March 2014. (DRPSAF ¶ 71.) She was then hospitalized for influenza from March 26, 2014 until April 21, 2014. (Ex. B 91:12–92:1.) From April 24, 2014 to May 13, 2014, she was on a medical leave for what she describes as a psychological breakdown due to her unsafe working

conditions. (*Id.* 92:23–93:5.) She was then granted a medical leave from May 15, 2014 to October 1, 2014 due to her feeling unsafe at work and her PTSD. (*Id.* 97:11–98:3.) During this medical leave, it does not appear that Muntean attempted to follow the steps suggested by IDHFS to get a transfer. She offers no explanation why she had to quit while still on a medical leave that lasted almost six months or why she thinks nothing would change at her workplace once she came back. Therefore, Muntean fails to present sufficient evidence to proceed on a constructive discharge theory. That does not, of course, mean that Muntean cannot prevail on her hostile work environment claim, but rather that IDHFS may be able to assert the affirmative defense that it exercised reasonable care or diligence to prevent and correct the harassing behavior, and Muntean unreasonably failed to take advantage of any preventive or corrective opportunities to avoid harm.

IV.     **Claims Based on Disability**

Muntean asserts that IDHFS discriminated against her on the basis of her disability by creating a hostile work environment, forcing her to quit her job, and failing to accommodate her PTSD. The Court considers each claim in turn.

A.     **Hostile Work Environment and Constructive Discharge**

In *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594 (7th Cir. 2009), the Seventh Circuit noted that it has "not decided whether allowing a hostile work environment is actionable under the ADA." *Id.* at 603. But even if such a claim were recognized, to prove a hostile work environment claim, the alleged harassment must be both subjectively and objectively so severe and pervasive as to alter the conditions of Muntean's employment and create an abusive working environment. *Id.* Muntean does not respond to IDHFS's argument that no hostile work environment action is allowed under the ADA, focusing instead on describing the severity of her work environment situation.

The only incidents of harassment that Muntean says were caused by her disabilities are certain co-workers making fun of her medical chair, commenting on her use of time off and extensive use of a washroom, and asking her to show her scars. (Dkt. No. 50 at 11; *see also* Dkt. No. 51-1 at 2, 3.) This is not sufficiently severe or pervasive to alter the conditions of her employment. *See, e.g., Mannie v. Potter*, 394 F.3d 977, 982–83 (7th Cir. 2005). Therefore, even if the hostile work environment claim would be recognized in the Seventh Circuit, Muntean's claim must fail. For the same reasons, to the extent Muntean claims that she was constructively discharged in violation of the ADA, her claim fails.

### B.    Failure to Accommodate

To survive motion for summary judgment on her failure-to-accommodate claim, Muntean must present evidence that (1) she is a qualified individual with a disability; (2) IDHFS was aware of her disability; and (3) IDHFS failed to reasonably accommodate her disability. *See James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013). Additionally, a plaintiff must normally request an accommodation before liability under the ADA attaches. *Id.*

IDHFS argues that Muntean was diagnosed with PTSD only in May 2014, and there is nothing in the record to suggest that she asked for a reasonable accommodation based on this disability—Muntean simply requested to be transferred away from Rodriquez because she was feeling "unsafe." IDHFS also argues that it did not fail to respond to her request, but instead referred Muntean to the union and the Bureau of Internal Affairs to address her concerns. Muntean responds that she actually told IDHFS about her PTSD by providing a physician's statement describing her condition, and that IDHFS kept putting the responsibility back on her by referring her to other channels.

Although it appears that in her earlier emails Muntean simply requested a transfer based on "feeling unsafe" after the incident with Rodriguez, she also testified that she later provided a physician's statement describing her condition to IDHFS. (PRDSUF ¶ 46; Ex. B 117:5–119:8.) However, the record reveals that Muntean was not diagnosed with PTSD until May 13, 2014. (Dkt. No. 63 at 3; Ex. B 118:11–119:5.) So up until that point, even Muntean did not know what she was suffering from. (Ex. B 119:4, 5.) Hence, it would be unreasonable to assume that IDHFS was aware of Muntean's PTSD before that date. After her diagnosis, Muntean was granted medical leave from May 15, 2014 to October 1, 2014. Muntean has not pointed to any evidence indicating that she followed through with IDHFS's recommendation on how to initiate her transfer with the union. (PRDSUF ¶¶ 43–46.) Thus, there does not appear to be a genuine dispute of material fact as to whether IDHFS failed to accommodate her disability and Muntean's claim fails.

## V.        Retaliation Claim

Muntean also asserts that IDHFS retaliated against her for complaining about the discrimination she experienced at work. To make out a claim of retaliation under Title VII, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). IDHFS argues that Muntean did not engage in protected conduct or suffer an adverse employment action as a result. Muntean counters that she complained to her supervisor and ADA/EEO officer about the discrimination she experienced, but nothing was ever done to remedy the situation. But a failure to address Muntean's complaints is not enough to sustain her claim for retaliation. *See Huppert v. Potter*, 232 F. App'x 576, 581 (7th

Cir. 2007).[4] Otherwise, every unaddressed complaint of discrimination would also raise a retaliation claim. In her response to the motion for summary judgment, Muntean points to no other adverse employment action linked to her complaints of discrimination. (Dkt. No. 50 at 13, 14.) Hence, her retaliation claim fails.[5]

## VI.    Punitive Damages

Finally, IDHFS argues that because it is a government agency, Muntean cannot recover punitive damages on her Title VII claims against IDHFS. Muntean did not respond to this argument. And indeed, IDHFS is correct. Punitive damages are not available under Title VII against a government agency, such as an agency of the State of Illinois. *See Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1032 (7th Cir. 2003). Muntean cannot recover punitive damages on her Title VII claims.

## CONCLUSION

For the reasons stated above, IDHFS's motion for summary judgment is granted in part and denied in part. The motion is granted to the following extent. Muntean's Title VII claims based on discrete events that occurred before January 30, 2014 are time-barred, her claim based on religion fails, and her claims based on race and national origin are dismissed to the extent they are based on an unequal lunch break policy and requirement for daily accountability reports. While Muntean's hostile work environment claims survive, she cannot proceed on the theory that

---

[4] *Huppert* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

[5] IDHFS's motion for summary judgment suggests that Muntean brought claims for retaliation not only under Title VII, but also under the ADA. However, Muntean's complaint does not contain retaliation claims under the ADA as Count III only claims violation of Title VII. Her response to the motion for summary judgment does not suggest it either. Accordingly, the Court does not need to address this issue. However, if Muntean were to bring a retaliation claim under the ADA, it would suffer from the same problems as her retaliation claim under Title VII.

the hostile work environment resulted in a constructive discharge. Muntean's claims based on disability and retaliation fail. And finally, Muntean cannot recover punitive damages for her Title VII claims against IDHFS.

ENTERED:

Dated: September 30 , 2018

_____
Andrea R. Wood
United States District Judge